UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In Re:

ECOM AUTHORITY, LLC,

    Alleged Debtor.

_____/

Case No. 25-17808-LMI
Involuntary Chapter 7

### ASSIGNEE'S JOINDER TO ALLEGED DEBTOR'S MOTION TO DISMISS INVOLUNTARY PETITION OR ALTERNATIVELY, FOR ABSTENTION

Philip von Kahle, the statutory assignee ("Assignee") for the benefit of creditors of ECOM AUTHORITY, LLC ("Alleged Debtor"), files his joinder to the Alleged Debtor's request that the Court dismiss this involuntary bankruptcy case or abstain [ECF No. 9].

Presumably counsel for the petitioning creditors takes no issue with the legitimacy of Florida's assignment statute or the Assignee and the undersigned serving in this case. After all, she has personally represented numerous assignors and assignees in Florida, is an active participant on the committee advocating for the passage of a uniform statute relating to assignments for the benefit of creditors and other lawyers at her firm currently represent the Assignee, alongside the undersigned, in a large complex assignment proceeding in this circuit involving a nine-figure fraud.

The issue then seems to be whether there is a strategic advantage in liquidating the Alleged Debtor in this forum versus the state court. There is none. To the contrary, proceeding in this forum will result in a significant disadvantage that harms creditors, particularly as to litigation claims. Thus, the Assignee joins in the arguments raised by the Alleged Debtor and separately sets

Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL  33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**

forth the following additional points for consideration by the Court in ruling on the motion.  In support, the Assignee states the following:

1.      The mission here is straightforward for the Assignee or any panel trustee: Maximize the recovery for creditors of the Alleged Debtor.

2.      In this instance, fulfilling this mission requires the monetization of the Alleged Debtor's inventory and prosecuting and resolving litigation claims.  Each is addressed below.

**A.  The inventory**

3.      The first category – liquidation of inventory – is involved and requires some background discussion on the quality of the inventory and competing interests in it.  This background guides the Assignee's strategy.

*The Quality of the Inventory, Competing Interests in it and Status*

4.      The Alleged Debtor raised funds from "clients" to acquire inventory in bulk to then be sold on the clients' virtual storefront on Amazon or Walmart.

5.      The inventory acquired by the Alleged Debtor was mainly low-end consumer goods such as toothpaste or personal hair trimmers.

6.      The process generally consisted of the Alleged Debtor purchasing the goods, having the goods delivered to its warehouse and then repackaging and shipping the goods to a warehouse controlled by others, such as Amazon or Walmart.  When the shipment was sent by the Alleged Debtor to Amazon or Walmart, the Alleged Debtor would then allocate particular goods to a client's store and label them as such.  Amazon or Walmart would then allow the client to sell these now allocated goods on the client's virtual storefront.

Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL  33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**

7.      In raising monies to purchase inventory, a client's funds were not segregated at the outset by the Alleged Debtor or allocated to buy specific items for the client, *i.e.*, client A did not send $20,000 to the Alleged Debtor to purchase $20,000 worth of Samsung TVs in the client's name.  Instead, the client would deposit funds with the Alleged Debtor which the Alleged Debtor would then pool with other monies.

8.      Some of these goods are currently located at the Alleged Debtor's warehouse in Medley, Florida ("Medley Warehouse") under the control of the Assignee ("Warehouse Goods") or at the Assignee's warehouse for further review.  Other goods purchased by the Alleged Debtor are now located at warehouses under the control of Amazon or Walmart.  Importantly, the Assignee, based on his review of how the Alleged Debtor operated its business, is not asserting any ownership interest in this latter category of goods located at third-party warehouses.[1]

9.      This then leaves the Warehouse Goods and what to do with them.  The Warehouse Goods can be broken down into four buckets:  (1) new goods purchased by the Alleged Debtor; (2) buyback goods that did not sell on Walmart or Amazon and the Alleged Debtor repurchased the goods from clients and put back into its general inventory, (3) returned goods from end users that are not located in any computer inventory and (4) client goods returned from Amazon or Walmart that have client identifiers.

---

[1] Indeed, the Assignee understands that Walmart – pursuant to its contractual agreement with each of the Alleged Debtor's clients – is in the process of contacting them and arranging to ship the goods assigned to a particular client's virtual store pursuant to instructions provided by the client. As to Amazon, virtual stores for clients associated with the Alleged Debtor were frozen over a year ago.  Prior to the assignment, the Alleged Debtor entered into a settlement with Amazon that must now be completed and approved, either by this Court or the assignment court.



Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL  33131**
T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com

10.     As for new goods – which is the bulk of the inventory located at the Medley Warehouse – the Assignee, based on how the Alleged Debtor operated, asserts that it likely belongs to the Alleged Debtor subject to the lien interest of the sole secured creditor, Settle Funding, LLC As to remaining categories, there may be one or more clients of the Alleged Debtor that would assert they own some of them and they are not property of the Alleged Debtor.  The secured creditor may also assert its lien interest covers some of these returned goods.

11.     Understanding that a dispute of this nature could arise, the Assignee and his team did an extensive review of the inventory to determine its value.

12.     The most important observation from the Assignee's review is that many of the goods in the Medley Warehouse – whether new or returned – are grey goods.  The impact is that the value is materially less compared to goods sold through authorized distribution channels. Thus, regardless of whatever ownership or lien interest is asserted, recovery is likely compromised.

13.     This happenstance is even more applicable to returned goods.   Not only are they likely grey goods, but in many instances, the packaging on the returned goods has been damaged or the goods opened and used.

14.     To preserve whatever value all these goods may have – both new and returned – the Assignee has paid – with funds on hand – the rent, insurance and related expenses for the Medley Warehouse.

*The Inventory Strategy Going Forward*

15.     The Assignee's intent is, subject to approval by the assignment court, to liquidate all new goods owned by the Debtor.  To the extent the funds are subject to the secured creditor's lien, then the secured creditor's claim will be paid off with such funds, thus eliminating or reducing

Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL 33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**

an approximate $3.5 million claim against the assignment estate.   This process will be done in a transparent manner with all stakeholders having the ability to address any dispute with the assignment court.

16.     As for the returned goods in which a client  has ownership, the Assignee intends to present a plan to the various stakeholders to liquidate the goods or ship them to the particular client if appropriate.   This process will also be done in a transparent manner with all stakeholders having the ability to address any dispute with the assignment court.

17.     Lastly, it is important to note that liquidation be done in an expeditious manner. The monthly expenses to preserve the inventory in the Medley Warehouse are significant and as more time passes, the value of the goods, particularly consumable items such as toothpaste, decreases in value.

18.     This is not a novel strategy but execution and timing is critical.  On this point, the Assignee and his firm have decades-long operational experience in handling complex liquidations of this type.  And the state court judge assigned to this matter – the Judge Lisa Walsh – is well versed in the various issues that arise in assignment cases.

19.     Importantly, there is likely **<u>no advantage</u>** to accomplishing this strategy in this forum.    There is nothing in the Bankruptcy Code that affords a trustee superior powers to the Assignee to liquidate the inventory.  Indeed, a panel trustee would most likely retain Assignee – or someone like him – to do as much which just causes more administrative expenses.  These additional expenses are of course borne by the creditors.  Or alternatively, a panel trustee may determine the inventory is too much of a burden and abandon any interest the bankruptcy estate has in it.  The result of such a decision is a mad scramble amongst the stakeholders to secure the

Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL  33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**

inventory, which likely increases the monetary losses of everyone – including the secured creditor – and results in a larger claims body.

20.     Indeed, the Assignee and undersigned counsel have invited the petitioning creditors to address this issue and its impact on **all** creditors.  They have declined to do so.

**B.     Litigation claims**

21.     The second category – litigation claims – is the most likely source of meaningful recovery for creditors of the Alleged Debtor.

22.     Litigation claims in a case of this nature typically consist of clawback claims and common law tort claims.

23.     At the outset, there is **no advantage** in this forum with respect to clawback claims.

24.     When undersigned counsel was alerted to the filing of this case and asked counsel to the petitioning creditors why the involuntary filing was pursued, counsel to the petitioning creditors responded because the Assignor had no standing to bring fraudulent transfer claims against insiders.  Undersigned counsel quickly outlined why such argument was both legally and factually inapplicable.[2]

25.     As for preferential transfers, putting aside the amount at issue is dwarfed by the potential claims body – the 90-day window for avoidable preferences made by the Alleged Debtor is reduced because the involuntary was commenced more than 30 days after the assignment

---

[2] Undersigned counsel just concluded a multi-year case as co-counsel with other lawyers at Stearns Weaver litigating this very issue in a different assignment case in which Mr. von Kahle serves as the statutory assignee. In that case, the argument had legs because the assignor's creditors had properly perfected liens on the deposit accounts in which transfers were made from; that is not the situation here.  It is unknown whether the petitioning creditors still assert this argument, but the Assignee is prepared to address why it is incorrect if necessary.



Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL  33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**

occurred – there are likely significant defenses and collectability issues that could be asserted by any target.

26. Moreover, there is an obvious **<u>disadvantage</u>** in litigating common law tort claims in this forum. The Alleged Debtor is 100% owned by Daniel Cohen. Many of the clients, including the petitioning creditors, assert that the Alleged Debtor was effectively an engine of theft.

27. The Assignee does not think it is appropriate to commit to a position on this assertion by clients at this time; it serves no strategic purpose. But to the extent it is determined that Mr. Cohen committed wrongdoing and that such wrongdoing can be imputed to the Alleged Debtor, then third-parties likely have significant affirmative defenses at their disposal. And these defenses could serve as an absolute bar to any tort claim. The Assignee, however, is statutorily immune to all such defenses. *See Fla. Stat.* § 727.108(1)(b).

28. This is not an academic point. Regardless of the Alleged Debtor's solvency over the past several years, litigation targets such as brokers or marketing firms will assert that transfers received by them were in satisfaction of the Alleged Debtor's contractual obligations and they are entitled to raise certain statutory defenses. This likely presents a meaningful hurdle to any fraudulent transfer claim whether asserted by the Assignee or panel trustee. Thus, it is imperative that tort claims be viable **<u>at all times</u>** and not compromised, either from a settlement or litigation value perspective. Proceeding in this forum does the opposite.

## C. Conclusion

Here, the clients of the Alleged Debtor have suffered significant losses. The Assignee's intent is to recover as much as possible for their benefit; he has done as much for other creditors in other cases for nearly forty years. There is no monetary benefit to creditors in liquidating the

Phang Feldman

**One Biscayne Tower | Suite 1600 |2 S. Biscayne Boulevard | Miami, FL 33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**

Alleged Debtor in this forum and the Assignee requests the Court grant the motion to dismiss or abstain.

Dated: August 19, 2025        PHANG & FELDMAN, P.A.
2 S. Biscayne Boulevard, Suite 1600
One Biscayne Tower
Miami, Florida 33131
Telephone: (305) 614-1223
eMail: service@katiephang.com

By:     */s/ Jonathan S. Feldman*
Jonathan S. Feldman (12682)
feldman@katiephang.com
Katie S. Phang (348650)
katie@katiephang.com

*Attorneys for Philip von Kahle as Assignee*
*in the Assignment for Benefit of Creditors*
*of ECOM Authority, LLC*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 19, 2025, a true and correct copy of the foregoing was served based on the Court docket, by transmission of Notices of Electronic Filing ("NEF") generated by CM/ECF to all parties registered to receive electronic filings in this case, including counsel for the Petitioning Creditors and the Office of the United States Trustee.

By:     */s/ Jonathan S. Feldman*
Jonathan S. Feldman (12682)



Phang Feldman

**One Biscayne Tower | Suite 1600 | 2 S. Biscayne Boulevard | Miami, FL 33131**
**T: (305) 614-1223 | (F): (305) 614-1187 | www.katiephang.com | feldman@katiephang.com**